The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, I mark you dry now and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Please be seated. Good morning and welcome to the Fourth Circuit. Judge Floyd, Judge Wynn and I are pleased to be hearing your cases this morning. First case is Odle v. United Mine Workers Pension Plan. Are the parties ready to proceed? We are. Okay. Mr. Hawkins? Good morning, Your Honors, and may it please the Court. Richard Hawkins of the Hawkins Law Firm. I'm here this morning on behalf of the plaintiff appellant, Veda Odle, who I'm privileged to have with me this morning in this Court. We are here appealing a summary judgment decision from Judge Jones, the Western District of Virginia, that granted summary judgment to the plan on both a substantive ERISA claim and a procedural ERISA claim. And the nub of the claim itself is whether or not Ms. Odle is entitled under the plan to a higher level of credited service than she was in fact awarded. As I said, there are two basic issues, substantive and procedural, and I suspect that the procedural one swallows the substantive one for purposes of our appeal. And that is whether or not Ms. Odle was denied a full and fair review during the administrative process. As I'm sure the Court is aware, the full and fair review requirement is enshrined in the statutory language of ERISA. Title 29, section 1133, subsection 2 says that a plan shall afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim. And the federal regulations then amplify that and put some meat on the bones to what that requirement means. And for our purposes here, the federal regulations which we cited in our brief very specifically say that the claimant must also be given a reasonable access to documents relevant to her claim. Now, Mr. Hawkins, the Dale Cole audit is really the crux of your case, isn't it? The fact that your client did not have access to that audit. That is correct. What would the audit have shown from your perspective, or what were you looking for that you needed to look at the audit? Many things. The first answer is the audit would have shown us the source documents for what the claim was. And you may recall that both the pre-hearing officer and then the hearing officer themselves summarized and simply said there is an audit, no dues were reported, no hours were reported, and it looks like you were called a bolter and a foreman. Now prove us otherwise. What we would have had is we would have had the documents that purported to show that. And then we would have known, and this is important, is that it wasn't simply a foreman and bolter and foreman and bolter. It was a vacillation. And in our submission, that vacillation means that Mr. Odle, the mine worker, of course, could have, and in our submission is and was, a working foreman. And a working foreman, under the language of the plan, is somebody who is still entitled to union credit even if that person is working as a working foreman, a substitute for a foreman, so long as that he doesn't hold that position for 120 straight days. And if the court looks at, and it's in the appendix, the summary of listing of dates from 1988 and 1989, you will see that there is clearly not 120 consecutive days where Mr. Odle was listed as a foreman. So if you have bolter and then foreman, foreman, foreman, foreman, foreman, and then bolter, it's our position all of that is union credit. And we know from the audit that they did not give him that credit. So that would have been one of the first things we would have challenged. We also know from the daily foreman reports, and these are in the record. I believe they're joint appendix 126 through 134 or 136. They show that not only was he listed in this manner, but he was paid and designated as paid in hourly shifts. So there are some records in 1992 and 1993 that show that he was designated as, quote, shift. Was it true that there was overtime paid to him? Absolutely, and two very significant points about that. First, there was overtime in 1990, okay, and we know that. It's very clear. It says it right there. And it's an eight-hour payment of overtime, and we know that that's inconsistent with simple salary work. We also know that if we had known that was something that they had in the record, we would have challenged it, and we would have shown, and I can tell, I can proffer for the court that Ms. Odle has in her possession and would have provided pay stubs that showed that Mr. Odle was getting paid overtime in 1989, in 1990, in 1991 from Dale Colt. And that is diametrically opposed to the notion of being paid on a salary. Something else that we noticed, and we would have pointed out to the review committee or to the reviewer, is that there's a reference that said in the audit that he was reported, Mr. Odle was reported to have been paid a salary. And you'll see there's a sheet where there's a bunch of names, and it says salary, salary, salary, foreman, bolter, foreman, bolter, foreman. We don't know when that was created, okay, and we know that the audit was conducted and completed in January of 1995. So by then, Mr. Odle had worked for Dale Colt since 1988, 88 to 94, and at some point, he did become a foreman. But he didn't become a foreman in 89 and 90, and what we would have known from this particular record, or what we could have discovered or tried to discover by asking the auditor, is when did Dale Colt provide that information? When did they say he was a salaried employee? Was it 1994? Was it 1993? Or was the company going to take the position that he was always a salaried employee? And we obviously would disagree with that. And I think one of the other things, and Magistrate Judge Sargent pointed this out, raised it as a huge red flag, and the more you look at it, the more it becomes obvious that it's a red flag. There's so many people working in management and nobody. Correct. I mean, there was one sheet, and we would have tried our best to find more information on that, but there's one shift that is 50-50, a 12-person shift, six person or four persons, and six are classified employees. And I think it just befuddles the mind to think that it's reasonable that a mind shift would require one foreman per one classified person. Let me ask the question. Yes, sir. The ERISA statute noise implementing regulations don't seem to mention at all that any level of noncompliance is acceptable, and there are some courts that have gone that way, but are you in agreement with your opponent there that the standard here would be substantial compliance with the regulation, which is what was applied by the district court? I believe Ellis requires that. I believe this court in Ellis v. MetLife said that if you don't have strict compliance, the next question is substantial compliance. But in order to be substantially compliant, the Ellis court, as it explained, the administrator must do something to, quote, neutralize the harm of the failure to strictly comply. And in Ellis, of course, they had not provided a particular roundtable medical summary to the claimant, but they had provided it to the claimant's doctors, who were the experts in that case. So there was no harm there. How would you respond to the district court's finding that substantial evidence supports the decision, even if the audit wasn't given? In other words, does that make the procedural claim a harmless error? No, sir. Why not? Well, because first and foremost, the court reached that conclusion analyzing the booth factors, of course. One of those booth factors is procedural deficiencies, and we think that right there would have undermined the entirety of the district court's analysis. But the district court did focus on substantial evidence, such as lack of union dues, such as lack of reporting of hours. But it did so in a way that downplayed the Dale Cole audit favorable information. And I've pointed this out in our brief, and I would invite the court to review the district court's opinion. Nowhere in the district court's opinion did Judge Jones address, mention, analyze anything the overtime issue. That was a key feature of our argument in front of the magistrate. It was a key feature of our argument in our objections and our response to the plan's objections. And I think that is, I'll cast no aspersions, of course, but I think that is a failing that negates the district court's finding. I think what that shows is that there is not substantial evidence. And we also take the position, we've taken the position, that there was not a proper application of the work informant rule. There was not a proper application of the notion that you cannot, you can't have a de facto rule where the plan requires that you must rebut documents with documents. You must rebut one kind of evidence with another kind of evidence. So what happens here if we agree with your procedural argument, then you would say you're entitled to have this audit report? Yes, sir. And you then go back and we don't even get to the substantive issue today? No, sir, you do not. And I think that's the right course of action on this record. I mean, we have taken the position that we would be entitled on this record to at least 89 and 1990. But I think in light of this court's strong policy in Gagliano that normally when there's a procedural error, the court, the best course of action is to remand. I think the record needs to be more fully developed in this case to make it clearer that 89 and 90 are accredited service dates and that accredited service dates should also be awarded for the remainder of those years. Now, Mr. Hawkinson, looking at Judge Jones's opinion and trying to figure out where he may have gone off the track from your perspective, it seems to me looking at page 11 of his opinion, at page 566 of the record, the judge is saying, most importantly, there is no credible indication that the actual disclosure of the audit to Mrs. Odell would have made any difference. So the judge seems to me was imposing a prejudice requirement on you, arguably. Do you agree or not? And if so, was that appropriate? I don't know if I'd use the word prejudice. I think Ellis uses the word causation. There must be a causal connection to your inability to provide additional information. I think what the judge was essentially saying, and I don't think this is the standard, is that we had to prove that we would win, that it wouldn't just make a difference but that we would prevail. So you're saying that Judge Jones did impose a prejudice requirement in order for you to have access to that material? I'd say it's a prejudice plus because we were clearly prejudiced in the sense that we didn't have it, and having more information is always better than having less information. Right, the prejudice in the sense of affecting the outcome of the case. Yes, ma'am, I think he absolutely did that. Where did that term come from, prejudice plus? I just made it up. You mentioned Ellis, and going to Judge Keenan's question, you said it's causation, but Ellis, your explanation was okay, they didn't turn it over, but they let the doctors come in. Correct. Sounds like harmless error. Something very similar, but the court didn't use the word harmless error, and this court has never embraced the specific words of remand to be rejected as a, quote, useless formality. The best analysis of that kind of a situation comes from the Fifth Circuit in a case called La Soul. So causation to what? What do you mean causation? Connect that term. Impeded our ability to provide an important record, not necessarily one that we win on, although I think we would be able to do so, but I think if you as the administrator chop us off at the knees in terms of Your whole argument is that's the key piece of evidence here, the part of which they made the determination, you didn't get a chance to look at it. That's right. And at the end of the day, you ought to have a chance to look at it, because it had a lot of information you might have been able to use. That's exactly right. That's it. I can put some judicial gloss on it. No, you don't have to. But, yes, that is exactly our point. So the causal connection, then, is the fact that this went to the heart of the case. Absolutely. And it did so explicitly. Is there anything more that makes it a causal connection? There were anomalies in the existing record. Correct. So you're arguing that that gave it a causal connection, I take it. I do. Anything further that creates this causal connection that Ellis talks about? Again, nothing other than what they didn't provide us was not neutralized by any of their own other actions, because I think that's the distinguishing piece of it. Parties don't seem to agree on the standard of review. What is it? Well, for purposes of the full and fair review, I don't think the court needs to get into that issue, because I don't think it matters. I think it's an abuse of discretion. If it is that, then we should give the plan deference? You should, but not necessarily under a full and fair review analysis, because that's a separate inquiry. It's kind of a standing own claim, and we did bring, under count two of our complaint, a full and fair review argument and a full and fair review claim that was separate and distinct from the substantive review. But as the court is certainly aware, we think that this particular plan and its sister plans are subject to a stricter abuse of discretion standard of review than you would normally apply to, say, a disability benefits case or some other kind of ERISA remand or ERISA review, because we think this court in the Pratt decision invoked the D.C. Circuit's position in Maggard that this kind of review is subject to the review of a stern hand and a flinty eye, which means you give it greater skepticism. And we certainly think on the facts of this case and on the record in this case that that's warranted. If there are no further questions, we ask that the court reverse the decision and remand the case back to the plan administrator. Thank you. Okay, thank you. Ms. Porras? May it please the court, I'm Christina Porras for the 1974 pension plan and its trustees. We're here because Mrs. Odle is receiving a survivor's pension that the district court found was appropriately based on 15.5 years of Mr. Odle's credited service. No question you didn't turn over the 1998 audit. That's right. As required by the regulation. There's no question of that, right? Well, in our position, it was not required by the regulations because the audit papers themselves were not actually used as the basis of the benefit determination. That's a major dispute there because everything that's been represented here is that thing was important. It was the basis upon which was used by your client to determine whether this deceased had been a classified employee or whether he was a supervisor. You're saying it was not? No, Your Honor. Well, Your Honor, what I'm saying is the information in the audit was provided through an audit summary, which is plans practice. It's standard practice because the audit papers themselves. That it contains everything in the audit? That it should? I mean, it's one thing to give a, we're quite aware of this summary business, but we're talking about something that the ERISA regulations require. Why wouldn't you just give them the audit? Why give them a summary? And who summarized it? Your Honor, the actual auditor. Who summarized it? The auditor that conducted the Dale Cole audit provided the summary. And so how the process typically works is the plan pension staff processing the application or the hearing officer reach out to the auditors in the field and they say, you know, there's a dispute or there's an issue. Can you please provide any relevant information that this audit might have to this person's benefit determination? The auditors return a summary. And if you compare the decision on review from January 2012 to the auditor's summary, it is accurate. Apparently there was a lot of information. I don't want to cut you off on this. In that audit, apparently the petitioner here feels it would have been helpful. You know, when you get down to it, what's the big deal? Just go back, give them the audit, and go back through it the right way. So what's the complaint? Your Honor, remand would be inappropriate in this case because, first of all, the Fourth Circuit has stated that remand should be used sparingly when the record demonstrates that there was evidence the trustees completely disregarded or when it's a meager record. But if we did it, so what? We just say go back, give them the audit, do it again, so what? Well, Your Honor, if you said that, we certainly would. And how are you hurt by it? Because if that summary is the same as the audit, you're not going to be hurt at all. Your Honor, first of all, every review was full and fair because the audit summary is the information that was generated in the course of the benefit determination in accordance with the regulations. Right, but there's a subjective determination on the part of the person who's doing the summary of what's important and what's not important to be gleaned from the audit as a whole document. And isn't that what the crux of the situation is? Somebody else was making the subjective determination of what was important and needed to be known, and Mrs. Odle had no access to that judgment in terms of, and it goes to Judge Wynn's question. Judge Sargent's a good judge, a magistrate judge, and the thing that keeps stopping me in this analysis, I'm not saying the plan was trying to be unfair, but does the record show why you didn't hand this over? I mean, you want confidence in terms of people believing you're doing the right thing. I mean, is there an institutional reason for not giving this to the applicant? Your Honor, yes. The audit papers are hundreds of pages long, and they contain confidential and proprietary information on not only the company, but on all of the other mine workers that are included in the audit. Okay, well, you'd have a right to a redaction then, wouldn't you? I mean, that could become an issue in terms of your rights to preserve confidential information. So that's really not an answer. You would be able to go back to the magistrate judge and to say, well, yeah, and go back to the court and say, look, we can't have all of this disclosed. So, again, what's the why? Why can't you do it, provide the non-confidential information that's in its raw form, rather than somebody else's subjective analysis? Well, Your Honor, it's simply planned practice to include the auditor's summary first. And the reason for that is because of the administrative burden to have to redact for each individual person and include that in the pension file. And the record management team who's responsible for turning over the file is focused on providing what was used in the making of the benefit determination. And there's no question that the information in the audit was used. But the information in the audit, the DOL has stated that the trustees are entitled to rely on the judgments of their staff when that staff is prudently selected and well-trained. And in this case, an audit was conducted, and if you take a look at the audit papers, which were ultimately turned over, and so there is substantial compliance in this instance, you'll see that there's a narrative you can find in the record. What do you mean? You're saying the audit, this is like Ellis? You know, in Ellis, which is a case you rely on, at the initial hearing it wasn't given, and then later on a comprehensive report was given, and the court essentially said, well, okay, that's no cause of connection now because that's been broken. You're telling me that you did that in this case? Yes, Your Honor. Well, first of all, we are of the opinion that every review was full and fair because she had all of the relevant information as required by the regulations. But even if you see that the audit papers should have been turned over, they eventually were. And not only are they, but you can see in the auditor's records that having the audit papers in hand would not have changed this outcome for Mrs. Odle. And that's because they narrate in the back, and you can find in the record on pages 143 through 145, that they address the inconsistencies that Mrs. Odle is now claiming she could challenge. And they're there to find classified employment where they can because that's how the plan is funded. There was a lot of stuff in this audit report, and I know we could probably disagree in terms of what's there, but really not our job to parse out these facts and see if it's all there. You may be correct, but that's a good argument to make. But, I mean, the test points out, you know, there was information about other employees. I don't know if that's redacted or not, but if you've got other employees who were classified employees in some sense, but in fact said that they were supervisors, that's a problem. And then if you've got information that says that, well, you maybe have, I can't remember the number, but you've got 17 employees, and 15 of them are supervisors. And there's every incentive for the company to classify people as supervisors because you don't have to pay into the pension fund. That's pretty relevant information. I mean, who has 15 supervisors out of 17? I'm just giving that number. I know that was an absurd number. Light that in there. But you didn't tell that in the summary. No, Your Honor, you're right. It wasn't included in the summary, and it wasn't required to be included in the summary. Oh, well, wouldn't it have been? That's what you call circumstantial evidence, isn't it? It's not direct evidence that he was a classified employee, but it's certainly circumstantial evidence that something funny may have been going on. Yes, Your Honor. And I agree with you that it is absolutely in the employer's interest to misclassify their employees so that they do not have to report employer contributions. But the trustees have one maximum authority to correct that, and that's on the audit. The wage agreement authorizes the trustees to randomly – Even if you got other employees to sing the hoed and said, look, I knew the deceased. He was here working all the time as a classified employee. Every now and then he'd fill in as a supervisor. That's outside the audit. You got that plus the audit. And your evidence is only the audit, but all they get is a summary of it. That doesn't sound like it's fair at all. Well, and then on top of that, didn't the audit find that employees were being misclassified? I'd like to answer your question in two parts. Answer that one. I want to hear the answer to that. Didn't it find that some employees weren't being properly classified or put in a proper category? Was misdesignating employees? Yes, Your Honor. Did you put that in the summary? I do not believe that was included in the summary, no. Wouldn't it have been nice to know that if you think you were in there trying to say that I'm not classified properly, that you and your own audit says that there were people who weren't properly classified? I'd like to retract a statement that I said. It was discussed in the summary that Mr. Odle was misclassified. Now, it wasn't identified that others had been misclassified as well. But the point that is important about the audit is that the narrative states, that they address in the narrative, that there were multiple foremen on the list. They address that Mr. Odle was sometimes listed as a bolter and sometimes listed as a foreman. They address that Mr. Odle was misclassified. And they further address that at the end of the day, after looking at all of those records, they corrected and found classified employment where it was warranted based on the documents submitted to them during the audit. So there's really very little that having the audit papers could change because the auditors are trained. They have, at a minimum, a bachelor's degree. So if it goes back and we say give them an audit, your position is going to be the same, right? Well, our position is that Mrs. Odle had three appellate opportunities to produce any and all substantial documents. I understand the procedural argument you're making and that you had every opportunity. But I'm giving you a reality. If we send it back, you're telling me it won't be any difference because everything you're saying is all that's going to come out of here. Is that right? Well, Your Honor, if this case is remanded, Mrs. Odle would be given a full and fair review and any evidence that could come up would be reviewed. However, there's a substantial… But you're telling me that the addition of giving that audit would make absolutely no difference because you gave her all that information anyway. Well, what I'm saying is that the audit confirms other substantial documented evidence in the record. The audit is not the only evidence. Right, but what you're saying, Ms. Parris, you were saying earlier that the information showed that there were indicia with regard to Mr. Odle and whether he was a classified employee. But if you look at 143 of the record, it talks about some employees on the timesheet who appeared to be doing classified work but were not having their hours reported. I mean, they're talking about other employees, too, and you just said that wasn't the case. I did not say that wasn't the case. I said it wasn't included in the summary, which is accurate. The summary only speaks to Mr. Odle. Okay, so here's something pretty significant then on page 143 of the appendix because you've got them talking about the audit was talking about other employees who were misdesignated, not having their hours reported. So why isn't that significant? Your Honor, I agree with you and I acknowledge that other employees were misclassified during the audit, but why it's not significant is because the auditor's corrected for all of those employees and the narrative makes that clear. Well, why did you use the audit at all? Because the audit, Your Honor, is relevant information, and that information was included in the pension file. The information that was used to make the benefit determination was included in the pension file. So it's not our argument that the audit is irrelevant. What's relevant? Is the audit relevant or is your summary relevant? The information contained in the summary is all relevant. If you didn't give the relevant stuff, you only gave our summary. So which one is relevant? The information contained in the summary is the relevant information because it's what was used to make the benefit determination. But I'd also like to point out that the audit is only secondary to the primary evidence in this case, which is that no hours were reported for Mr. Odle. And signatory employers report classified employment as credit hours on hours reporting forms, and that's the first primary evidence of whether or not classified employment exists. Wasn't there some adjustment in this process where you did give him some benefit in the indication I know there was a .25 and maybe another period of time here that was allowed? Wasn't that allowed that you found out, okay, in fact, you should be classified as a classified employer? Yes, Your Honor. Mr. Odle was given additional accredited service after additional primary documents. Did those indicate hours or not? I'm sorry? Were there hours that were involved in that or not when you did that? The additional credit was added because a pay stub was submitted by Mrs. Odle, which showed that Mr. Odle worked in 1984 for Gone Under Coal, and that the pay stub demonstrated that he had classified hours. Gone Under Coal was also reporting hours for Mr. Odle in that year, so there was evidence that he was working in a classified position for Gone Under Coal. And his Social Security wage records for that year demonstrated that he received the salary that the pay stub said he received. So there was corroborating evidence to grant that additional credit. And that highlights the trustee's – I'm sorry, Your Honor. If you used the plan, and you did, it was obviously – I guess one could assume it was important to you, so why is it important to the claimant in this case? Well, first, the first answer to your question would be without the audit. I mean, there are cases where there is no audit. There are times when no audit exists. And so the first – the primary evidence that would be used is have hours been reported to the plan, and are there other corroborating documents that support that lack of hours. And in this case, the union dues records showed that Mr. Odle paid inactive or no union dues at all, and his Social Security wage records highlighted that he earned his highest – first of all, who he worked for and when, that he also worked for non-signatory employers in 95 and 96, but also that he earned compensation at his highest amounts beginning in 1989 and thereafter, and that he earned them in amounts high enough and consistently enough to support that he was a non-salaried foreman. And that evidence alone is reasonable, that a reasonable mind can conclude Mr. Odle was a foreman. Okay, what about the auditor's conclusion, though? Didn't the auditor say that when he was listed as a foreman after February 2nd, 1989, there were three foremen and one bolter listed per shift? And that's page 144 of the record. Now, how does that give us confidence if there are three foremen watching one person do his work? I mean, isn't that common sense that there's a problem? Yes, Your Honor, and again, the auditor's noting that highlights the fact that they anticipated this inconsistency, and they are used to these types of things. They go to small minds, people that write the timesheets aren't always as accurate as they can be. I would also note that the overtime issue in this case, every single person on that sheet was listed as receiving overtime. It was also a Saturday. I know that it's common that the timesheets don't accurately reflect, and again, that's why the audit is conducted. That is the trustee's maximum authority to correct and enforce classified hours where they're warranted. And so your point is well taken and also highlights that the auditors reviewed those inconsistencies. They noted those inconsistencies, and they accounted for those inconsistencies when they made their determinations. And because they were prudently selected and well trained, the trustees are entitled to rely on that determination. And the fact that their summary doesn't include a review of every inconsistency that they used in providing the information to the hearing officer is immaterial. When you say an inconsistency, you mean improper reporting. Yes, Your Honor, improper reporting. And there's no question that Dale Cole did that, and there's no question that employers would do that. But that's why the audits are conducted. Otherwise, the trustees have to rely on what's reported to the plan alone. But the whole basis of that case is that there was improper reporting here. And this is what you're saying the audit showed. We may be going in circles on this, and it's all a question in terms of whether there's substantial compliance here or whatever. But the idea being if it shows improper reporting, this audit, then they're just saying we'd like to have a chance to look at this audit, this relevant evidence, make some determination of whether it's useful to us or not. From your perspective, the outcome is going to be the same because you say it doesn't matter. The summary covered all that stuff. Well, they say it didn't. And I don't know where we are in terms when you get into findings and things of that nature. I mean, we don't do that up here. We let it go back, and you guys hash this thing out, come back. I quite frankly don't see how you're harmed by just giving an audit if it's so benign as you say it is. It's not necessarily that the plan is harmed. It's that remand would be futile here because the record is Mr. Odell did not work in classified employment. It would serve us a purpose so we won't have to be up here dealing with these little facts you guys up here disputing. You know, he's pointed out some things that you've admitted, and some things in that audit just were not put on that summary. And it may sound futile, and you're right. Ultimately, it may be. They may lose. They've admitted that. All we're saying out of fairness, just do it. Well, Your Honor, at this point, I'd like to also point out that the record shows that Mr. Odell himself acknowledges he was a foreman during the years 1984 through 1996. Additional evidence that Mrs. Odell submitted was a self-employment history sheet that he submitted to the DOL for his black line benefits. And on that, now there's some inconsistencies there. He didn't list all of his employers correctly. But on that, he lists that he was a foreman as well as acknowledging that he performed some classified service. But for the relevant years, which corroborates other evidence that Mrs. Odell submitted in her letters to – So is that dispositive? Is that dispositive? He said before he died that he was a foreman? It's corroborating evidence, which also supports the audit and also – Corroborating what? The duration. I'm sorry. Corroborating what? Corroborating the facts that there are no hours reported for Mr. Odell, that the owner of Dale Cole says he can't remember when he became a foreman, which substantiates that at some point he worked classified, as the auditors found, and then became a foreman. And I'd also like to point out that Mrs. Odell's referencing this working foreman provision, but that doesn't exist in the plan. And what he's referencing is a temporary supervisor provision. And that's not a catch-all for us to apply any time there's a possibility that someone may have been misclassified. That is a provision in the plan where an employer can report its employees as filling in for a supervisor so that they're not taken out of classified status. And unless it's reported that way to the plan, the temporary supervisor provision does not apply. So relying on a working foreman provision that's really not included in the plan and relying on this temporary supervisor provision would be inappropriate. And further, this is the first we're hearing about Mrs. Odell having additional paystubs that show that Mr. Odell worked overtime in the relevant periods. But she was able to offer that information over the course of her three appellate opportunities and was told that she could submit official documents like paystubs. In fact, she did submit paystubs, and they were used to grant credited service. So remanding to the plan at this point would be sort of a useless activity first because, again, the record is clear that Mr. Odell did not work classified employment for a signatory employer for 250 hours between 1989 and 1996. But also because she knew the issues that were facing her. I'm sorry. I'm running low on my time. Would you mind if I use a few minutes to conclude? You can go until the light's red and now your time is up, but I think you've made your point very well, and we appreciate it. Thank you. Mr. Hawkins, Ms. Forrest is saying this is all about substantial compliance. You know, there were glitches here. There were glitches there. Correct. Why is she wrong? Because those glitches mattered. They were not with the spirit and the letter of the full and fair review. I think the important words are both full and fair. And Grossmiller and this court in Gagliano and all of the cases that we've cited indicate that you are denied a full and fair review if you're denied evidence that they rely on. And they without a doubt relied on this evidence, and they also without a doubt knew about these inconsistencies, about this improper reporting. And they held that from us. We did not know that. And I understand that you can see it in their answer. The plan says that, you know, this case is all about Ms. Odle trying to get a fourth appellate review, a fourth administrative review, and our position is that if the first one is failed, if the first one is tainted and the first one is unlawful, then so is the second and the third. And until a court tells them or they understand that the full and fair review requirements have not been met, it doesn't matter how many reviews we get. And I think it's important to focus on the exact language of what the plan told Ms. Odle. When it had the pre-hearing trustee conference and then it had the first review, it said, here are these items. And unless you can prove, it says, here's the audit. The audit says the following. And unless you can prove the audit wrong, we are not going to give you credit for those hours. And how can you prove the audit wrong if you don't know what's in the audit? Now, again, we may not win, but we have been denied the opportunity to ask those questions. And if we had seen, sure, Ms. Odle provided pay stubs in response to understanding what was being asked of her from questions from Mr. Hedrick and questions from Mrs. Turley. But if she had seen that they had paperwork in their possession that showed that there was overtime and had known that that would have made a difference at that point in time, she would have provided that information. She has it. She would have done so. She was denied the right to know that that kind of evidence would have been relevant, and she would have provided it accordingly. The only other thing I would say, and this is just a small rebuttal to what my friend quoted on the other side, I invite the court to look at Joint Appendix 47, which appears to be the actual summary of the audit that was done. And I would compare that with the beginning pages of the audit. It appears that somebody named Michael Stephen Keaton is the person who provided the summary. And if you look at the audit itself, there is nobody named Michael Stephen Keaton who is listed. So, again, we don't know the identities of these people. We never did. None of this was provided. We ask that the court find that the full and fair review requirements of ERISA were not met and to remand the case back. Thank you very much. All right, sir. Thank you very much. We'll come down and greet counsel and then proceed to our next case.
judges: Barbara Milano Keenan, James A. Wynn Jr., Henry F. Floyd